**INDIANA FARM BUREAU COOPER- ATIVE ASSOCIATION, INC., Appellant–Plaintiff,**

v.

**AgMAX, INC., Appellee–Defendant.**

No. 54A05–9207–CV–245.

Court of Appeals of Indiana, Fifth District.

Oct. 14, 1993.

Rehearing Denied Dec. 1, 1993.

<hr>

3. Gillespie also testified that K.H. experienced nightmares after hearing someone talk about Kern. Record, p. 173.

James A. McDermott, Stanley C. Fickle, Anne N. DePrez, Brian J. Martin, Barnes & Thornburg, Indianapolis, for appellant-plaintiff.

David A. Butcher, Stephen E. Arthur, George T. Patton, Jr., Bose McKinney & Evans, Indianapolis, Roger L. Miller, Miller, Martin & Stuart, Frankfort, for appellee-defendant.

RUCKER, Judge.

This is an appeal from an adverse ruling on cross motions for summary judgment. The Farm Bureau Cooperative Association (Farm Bureau) decided to merge with an Ohio-based cooperative and thus form a three-state agricultural cooperative. One of the members of the cooperative, AgMax, Inc. (AgMax) objected to the merger and sought to exercise certain statutory "dissenters' rights." Such rights permit shareholders to dissent to a merger and obtain payment for the fair value of their shares of stock. In response, Farm Bureau filed a declaratory judgment action seeking a determination that AgMax had no dissenters' rights. Thereafter, both sides filed cross motions for summary judgment. The trial court granted summary judgment in favor of AgMax holding that AgMax was entitled to exercise dissenters' rights concerning its entire interest in Farm Bureau. Farm Bureau now appeals raising a single issue for our review which we rephrase as follows: whether AgMax is entitled to dissenters' rights with respect to its nonvoting shares of stock and interest in the Co-op's reserves. We think not and therefore reverse.

**BACKGROUND**

Until September 1, 1991, Farm Bureau was a wholesale marketing and supply agricultural cooperative association, organized pursuant to the Indiana Agricultural Cooperative Act, Ind.Code § 15–7–1–1 *et seq.* Farm Bureau had fifty-nine members including AgMax. The members were all agricultural associations, which in turn were owned and controlled by their farmer-patrons. Farm Bureau issued two classes of stock: voting common stock with a par value of $100.00 per share, and Class B nonvoting preferred stock. While it was permissible for a member to hold more than one share of voting common stock, Farm Bureau's Articles of Incorporation limited each member to only one vote on all association matters placed before the membership regardless of the number shares a member held. The common stock was issued only to co-op members.

In contrast, the Class B Preferred Stock was issued both to co-op members as well as non-member patrons as "patronage dividends." At the end of each fiscal year, Farm Bureau would calculate its net savings after deducting reserves and losses. Thereafter, any savings were distributed to member and non-member patrons in proportion to their patronage for that year. In sum, the more members and non-members patronized the Co-op, the more preferred stock they would receive. In some instances the patronage dividends were paid in cash as well as shares of Class B Preferred Stock. According to Farm Bureau's Articles of Incorporation the preferred stock earned no dividends, carried no voting rights, and had no voice in the association's affairs.

Also, Farm Bureau maintained cash reserves for the purpose of properly safeguarding the business and affairs of the association. The reserves were of two types: (1) the patrons' equity reserve and (2) the general reserve. The equity reserve was allocated and credited on the books of the association to members as well as contract patrons. The patrons' equity constituted a capital advance made to the association and was to be repaid whenever the board of directors determined the account was in excess of the reasonable financial requirements of the association. On the other hand, the general reserve was appropriated out of net earnings or savings. Unlike the patrons' equity reserve, the general reserve was not allocated or credited to association members or contract patrons. Rather, if and when the board of directors determined that the general reserve was no longer needed, it could then pay out the reserves to the members and contract patrons in proportion to their patronage during the years in which the reserve had accumulated.

## FACTS

On April 12, 1991, Farm Bureau's Board of Directors tentatively agreed to merge with Countrymark, Inc., an Ohio-based cooperative. The merger proposal called for the resulting cooperative to have an organizational structure which would change the existing rights of the Farm Bureau membership relating to capital structure, voting rights of common stock, stock dividends, and the governing state law.

On April 30, 1991, Farm Bureau informed its members by mail of the proposed merger and sent each member a ballot to vote on the adoption of the merger agreement. Pursuant to Farm Bureau's Articles of Incorporation, each member was limited to a single vote on the merger. At that time Farm Bureau informed the members of their possible entitlement to dissenters' rights pursuant to Ind.Code § 23–1–44–1 *et seq.*

AgMax was one of two members to vote against the merger. On June 3, 1991, Farm Bureau informed AgMax that the merger had been approved by the membership. Thereafter, asserting its alleged dissenters' rights, AgMax made a demand on Farm Bureau for payment of its entire interest in the cooperative, including: (a) one share of common stock, (b) 28,811 shares of preferred stock, and (c) its proportional share of Farm Bureau's equity account and general reserve.

Farm Bureau filed a declaratory judgment action on July 24, 1991. In its complaint Farm Bureau asserted that: (1) AgMax had no dissenters' rights, (2) if AgMax did have dissenters' rights, it was entitled to exercise them, and thus entitled to payment, only with regard to its one share of common stock, and (3) in no event was AgMax entitled to exercise dissenters' rights, and thus receive payment concerning the patrons' equity reserve and general reserve. However, against the possibility that it might not prevail on all issues, Farm Bureau tendered $173,325.00 to the trial court as its estimate of the fair value of AgMax's common and preferred stock. AgMax objected and contended that it was entitled to more than three million dollars.

Both Farm Bureau and AgMax moved for summary judgment on the issues of whether AgMax was entitled to dissenters' rights and, if so, which economic interests

were involved.[1]  After conducting a hearing, the trial court granted summary judgment in favor of AgMax holding that AgMax was entitled to exercise dissenters' rights concerning its entire interest in Farm Bureau.  This appeal ensued in due course.

## DISCUSSION AND DECISION

### I.

■■■ The purpose of summary judgment is to terminate litigation for which there can be no factual dispute and which can be determined as a matter of law, thus eliminating unnecessary burdens on litigants. *Chambers v. American Trans Air, Inc.* (1991), Ind.App., 577 N.E.2d 612, *trans. denied; Rogers v. Grunden* (1992), Ind.App., 589 N.E.2d 248, *trans. denied.* When reviewing the propriety of a grant of summary judgment, this court applies the same standard used by the trial court: whether there is a genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law. *Liberty Mutual Insurance Co. v. Metzler* (1992), Ind.App., 586 N.E.2d 897, *trans. denied.*  All evidence must be construed in favor of the opposing party, and all doubts concerning the existence of a material issue must be resolved against the moving party. *Id.*

The material facts in this case are not in dispute.  Rather, resolution of the matters before us turns on how the undisputed facts relate to the Indiana Agricultural Cooperative Act, I.C. § 15–7–1–1 *et seq.* ("Act") and the Indiana Business Corporation Law, Ind.Code § 23–1–17–1 *et seq.* ("BCL").  The Act has no provision for dissenters' rights; however, the BCL does have such provisions.  The BCL is incorporated by reference into the Act, and therefore applies to cooperative associations "except where the provisions of [the BCL] are in conflict with or inconsistent with the express provisions of [the Act]."  Ind.Code

§ 15–7–1–28.  The BCL dictates in relevant part:

A shareholder is entitled to *dissent from, and obtain payment of* the fair value of the shareholder's shares in the event of . . .

(1) Consummation of a plan of merger to which the corporation is a party if:

(A) shareholder approval is required for the merger by IC 23–1–40–3 or the articles of incorporation; and

(B) the shareholder is entitled to vote on the merger.

Ind.Code § 23–1–44–8(a)(1) (emphasis added).

### II.

Farm Bureau contends the trial court erred in granting AgMax dissenters' rights with respect to AgMax's nonvoting Class B Preferred Stock.  According to Farm Bureau, AgMax has no such rights as to those shares and thus cannot obtain payment for them.

AgMax challenges Farm Bureau's assertion and counters: (a) shareholder approval for this merger was required by the Articles of Incorporation, and (b) under the BCL, classes of stock not otherwise granted the right to vote on a merger may do so where, as here, the merger would change the substantive rights of the shareholder.  Thus, according to AgMax, shareholder approval including holders of nonvoting preferred stock, was required for any merger and such shareholders are entitled to vote on the merger.

■■■ In support of its claim that the Articles of Incorporation require shareholder approval for mergers, AgMax directs our attention to provisions of the Articles and By-Laws which entitle holders of common stock to vote on any question or issue coming before the body.  According to AgMax this wording demonstrates that the Articles of Incorporation require shareholder approval for mergers.  We disagree.

---

1.  AgMax also moved for summary judgment on the grounds that the Farm Bureau/Countrymark merger was invalid because Farm Bureau failed to follow statutory procedures.  The trial court found for Farm Bureau on this issue and AgMax does not appeal the trial court's determination.

Our reading of Farm Bureau's Articles of Incorporation reveal they do not require shareholder approval for mergers. Indeed, the Articles of Incorporation, which are quite comprehensive, consisting of ten separate articles and over twenty sections and subsections, do not mention merger at all. We decline to read into this document provisions which simply are not present. Farm Bureau's Articles of Incorporation do not require shareholder approval for a merger. Thus, AgMax has not established one of the alternative elements for asserting dissenters' rights under I.C. § 23–1–44–8(a)(1).

AgMax counters that regardless of whether shareholder approval for merger is required by the Articles of Incorporation, shareholder approval is nonetheless required by Ind.Code § 23–1–40–3. Again we disagree. AgMax correctly points out that the BCL requires mergers to be approved by each voting group in a separate vote (*see* I.C. § 23–1–40–3(e)); that the BCL provides for separate voting by groups when the merger involves proposed amendments to the Articles of Incorporation that would require action by one or more separate voting groups on the proposed amendment under Ind.Code § 23–1–38–4 (*see* I.C. § 23–1–40–3(f)); that separate voting is required where the proposed amendments change the rights of all or part of a class of stock (*see* Ind.Code § 23–1–38–4(a)); and that this is true even if the articles of incorporation do not otherwise entitle the shares to vote (*see* I.C. § 23–1–38–4(d)).

■ There is no question that the BCL affords holders of nonvoting preferred stock certain statutory rights. However those rights may not be invoked if they stand in conflict with rights conferred by the Act. "Any provisions of law which are in conflict with [the Act] shall not be construed as applying to the associations herein provided for." Ind.Code § 15–7–1–19(a). "The provisions of [the BCL] ... shall apply to the associations organized or brought under [the Act], except where the provisions of [the BCL] are in conflict with or inconsistent with the express provisions of [the Act]." I.C. § 15–7–1–28.

The Act provides in pertinent part:

*An association may* amend its articles of incorporation, *merge* or consolidate with one or more other associations or corporations, effect special corporate transactions as defined in IC 23–1, or dissolve *by following the procedures specified in IC 23–1, except:*

(1) that an amendment to the articles of incorporation of an association organized or brought under this chapter or *an agreement of merger* or consolidation to which an association organized or brought under this chapter is a party *may be adopted, if the voting rights of the members are equal, by the affirmative votes of the majority of the members entitled to vote with respect thereto and voting at the meeting duly called for that purpose* or, if the voting rights of the members are not equal, by the affirmative votes of the majority of the votes cast by the members entitled to vote with respect thereto and voting at the meeting duly called for that purpose. . . .

Ind.Code § 15–7–1–8 (emphasis added).

The provisions of the BCL that would permit a holder of nonvoting preferred stock to vote on a merger are not consistent with provisions of the Act that allow such voting only by members. Nor are the provisions consistent with Farm Bureau's Articles of Incorporation which provide that Class B Preferred Stock "shall carry no voting rights." The term "member" with respect to an association having capital stock means a holder of voting stock. Ind.Code § 15–7–1–2(b). Farm Bureau's Articles of Incorporation as well as I.C. § 15–7–1–8 anticipate a one-member one-vote procedure when adopting a merger. On appeal AgMax does not challenge the trial court's ruling approving the procedure Farm Bureau followed in this case. In sum, those provisions of the BCL that require shareholder approval for merger of a for-profit corporation must yield to contrary provisions in the Act that permit a

one-member one-vote approval for merger of a non-profit agricultural association.

We also note that if Farm Bureau's nonvoting preferred stock were to acquire voting status for purpose of merger pursuant to the BCL, then all non-member holders of nonvoting preferred stock would have the right to vote on the merger. The notion that non-members could vote their financial interest and defeat an association merger desired by the membership is clearly at odds with the principle of democratic governance which underlies the organizational structure of cooperative agricultural associations.

AgMax insists, however, that regardless of whether its shares of preferred stock were entitled to vote on the merger, AgMax is nonetheless entitled to payment for the fair value of its entire proprietary interest in Farm Bureau including its preferred stock as well as the patrons' equity reserve and the general reserve. According to AgMax, as a holder of a single share of common stock, it was a shareholder "entitled to vote on the merger" and thus was "entitled to dissent from, and obtain payment of the fair value of the shareholder's shares," quoting I.C. § 23-1-44-8(a)(1). In essence, AgMax contends that its share of voting stock triggered its right to payment for its entire interest in Farm Bureau including the nonvoting stock as well as the reserves.

■ AgMax's argument must fail. As a holder of common stock, AgMax was a member of the association and thus entitled to vote on the merger. However, this right arose under the Act and not under contrary provisions of the BCL. As we have already determined, shareholder approval for the merger was not required by either Farm Bureau's Articles of Incorporation or I.C. § 23-1-40-3. Accordingly, AgMax was not entitled to use its nonvoting preferred stock to dissent from the merger and thus was not entitled to a payout for the value of those shares. The same is true for AgMax's alleged interest in Farm Bureau's cash reserves. AgMax was not entitled to use any such interest to dissent from the merger and thus was not entitled to payment.

AgMax further contends that under common law, if the shareholder had the right to vote on corporate action, then the shareholder was entitled to dissent to payment for its entire proprietary interest. According to AgMax, the dissenters' rights provisions of I.C. § 23-1-44-8 are consistent with common law and thus the same result is required. A contrary result, AgMax argues, would "allow a cooperative or other corporation to concentrate the shareholder's equity value in nonvoting shares, which Farm Bureau has done here, and then pay only a nominal sum to a dissenting shareholder." *Brief of Appellee* at 34.

■ We have no argument with AgMax's general proposition that dissenters' rights under the BCL are consistent with common law. However, we specifically hold that because Agricultural Cooperatives are bound by provisions of the Act, absent contrary provisions in the Articles of Incorporation, dissenters' rights are not available to Agricultural Cooperatives. Thus, any payment to which AgMax may be entitled for its proprietary interest in Farm Bureau must arise not as a result of statutory dissenters' rights but rather from Farm Bureau's Articles of Incorporation or other provisions of the BCL that are consistent with provisions of the Act.

The trial court erred in granting summary judgment in favor of AgMax and therefore must be reversed.

Judgment reversed.

BARTEAU and BAKER, JJ., concur.