ROBERTSON, Judge.
 

 Charles E. Hughes, III, M.D., brings this interlocutory appeal from the denial of his motion for summary judgment in this medical malpractice lawsuit brought by Angela K. Glaese. The sole issue on appeal, which requires that we reverse, may be restated as:
 

 
 *820
 
 Whether Dr. Hughes’ representation to Glaese that she was “okay” following her abdominal repair surgery constitutes an active fraudulent concealment of Dr. Hughes’ failure to diagnose and disclose the growth revealed in Glaese’s pre-opera-tive chest X-ray ordered by Dr. Hughes such that the medical malpractice statute of limitations has been tolled beyond the termination of the physician-patient relationship?
 

 FACTS
 

 The facts in the light most favorable to the nonmovant Glaese reveal that Glaese suffered an abdominal defect following a Caesarean delivery. She was referred to Dr. Hughes, a reconstructive plastic surgeon, for abdominal repair surgery. As part of the routine pre-operative work-up, Dr. Hughes ordered a chest X-ray. The X-ray revealed a rounded density. The radiologist’s report of the X-ray stated, “... this may represent an enlarged lymph node, but other mediastinal mass lesion cannot be excluded. A lateral view would be helpful to assist in localization of the density.” Dr. Hughes performed the abdominal repair surgery and briefly followed up on Glaese’s recovery. On November 14, 1989, Dr. Hughes released Glaese to her family physician and assured her that she was “okay.” Thus, the physician-patient relationship ended November 14, 1989.
 

 Almost three years later, on November 4, 1992, Glaese was diagnosed with Hodgkin’s Disease. Soon thereafter, Glaese learned that Dr. Hughes had affirmatively misrepresented her condition by failing to disclose to her the results of her 1989 chest X-ray and by telling her that she was “okay.” Glaese filed her proposed complaint against Dr. Hughes with the Indiana Department of Insurance less than three months later. Glaese alleges that Dr. Hughes committed malpractice by “simply ignoring, overlooking and disregarding” the chest X-ray, failing to communicate the results of the X-ray, and affirmatively misrepresenting that she was “okay.” Glaese asserts Dr. Hughes’ malpractice caused her to lose valuable time in her battle against Hodgkin’s Disease.
 

 Dr. Hughes sought a preliminary determination of a question of law in the trial court under Ind.Code 27-12-11-1, seeking summary judgment on the issue of whether the statute of limitations had run against Glaese’s claim. The trial court denied Dr. Hughes’ motion for summary judgment and this interlocutory appeal ensued.
 

 DECISION
 

 Initially, we must set out the well-settled standard for summary judgment. The purpose of summary judgment is to terminate litigation about which there can be no factual dispute and which may be determined as a matter of law.
 
 .Liberty Mutual Insurance Co. v. Metzler
 
 (1992), Ind.App., 586 N.E.2d 897,
 
 trans. denied.
 
 Summary judgment is appropriate only if “there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law.” Ind.Trial Rule 56(C). A genuine issue of material fact exists where facts concerning an issue which would dispose of the litigation are in dispute or where the undisputed facts are capable of supporting conflicting inferences on a dispositive issue.
 
 Scott v. Bodor, Inc.
 
 (1991), Ind.App., 571 N.E.2d 313. Summary judgment is appropriate when there is no dispute or conflict regarding facts which are dispositive of the dispute.
 
 Madison County Bank & Trust Co. v. Kreegar
 
 (1987), Ind., 514 N.E.2d 279.
 

 Summary judgment is appropriate if the designated evidentiary material shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.
 
 Rosi v. Business Furniture Corp.
 
 (1993), Ind., 615 N.E.2d 431. Indiana Trial Rule 56(C) expressly requires the non-moving party to identify specifically the parts of the pleadings, depositions, answers to interrogatories, and admissions on which he relies to withstand summary judgment.
 
 Id.
 

 On appeal from a summary judgment, the appellate court faces the same issues that the trial court did and analyzes the issues in the same way as a trial court does.
 
 Oelling v. Rao
 
 (1992), Ind., 593 N.E.2d 189. However, the party which lost in the trial court has the burden to persuade the appellate tribunal
 
 *821
 
 that the trial court’s decision was erroneous.
 
 Id.
 

 The Medical Malpractice statute of limitations, Ind.Code 16-9.5-3-1, is an “occurrence statute,” and the two-year period of limitations begins to run on the date of the alleged malpractice.
 
 Havens v. Ritchey
 
 (1991), Ind., 582 N.E.2d 792. The doctrine of fraudulent concealment, in its two species, active and constructive, was developed as an equitable doctrine to toll the statute of limitations under certain circumstances.
 
 Guy v. Schuldt
 
 (1956), 236 Ind. 101, 138 N.E.2d 891. Similarly, the concept of a “continuing wrong” has been adopted to define when an act, omission or neglect took place for purposes of determining when the statute of limitations begins to run.
 
 Havens,
 
 582 N.E.2d 792. In the present case, Glaese essentially concedes that her claim cannot survive under the theories of constructive fraudulent concealment or continuing wrong. Instead, she relies entirely upon the theory that Dr. Hughes committed active fraudulent concealment to keep her in the dark about the results of her chest X-ray. She asserts that his affirmative misrepresentation that she was “okay” causes the statute to toll beyond the termination of the physician-patient relationship.
 

 The medical malpractice statute of limitations ordinarily accrues when the injurious action occurs even though the plaintiff may not learn that he was the victim of malpractice until later.
 
 Guy,
 
 138 N.E.2d at 895. Usually, there must be some active effort (misconduct) on the part of the defendant in order for the doctrine of fraudulent concealment to be invoked so as to toll the statute of limitations.
 
 Id.
 
 However, where a fiduciary or confidential relationship exists, such as the physician-patient relationship, the physician has the duty to disclose material information to the patient and his failure to do so constitutes a concealment which will toll the statute even where the physician did not actively or purposely conceal his malpractice.
 
 Id.
 

 Where the fraud is of a active character, the concealment continues to exist and the statute is tolled until the patient discovers (or should have discovered) the malpractice.
 
 Id.
 
 However, where the duty to inform exists by reason of the confidential relationship (and not because of an active fraud), the constructive fraudulent concealment terminates when the physician-patient relationship is terminated.
 
 Id.
 

 An affirmative misrepresentation does not, as a matter of law, commence the ticking on the statute of limitations.
 
 Martin v. Rinck
 
 (1986), Ind.App., 501 N.E.2d 1086. That is because the affirmative misrepresentation may very well be the “affirmative or active concealing effort” ... or the “affirmative and active misconduct” of the tort-feasor which constitutes an active fraudulent concealment.
 
 van Bronckhorst v. Taube
 
 (1976), 168 Ind.App. 132, 143, 341 N.E.2d 791, 798. However, it does not follow that all affirmative misrepresentations constitute an active fraudulent concealment which serves to toll the statute of limitations beyond the termination of the physician-patient relationship. In
 
 Wojcik v. Almase
 
 (1983), Ind.App., 451 N.E.2d 336,
 
 trans. denied,
 
 we noted:
 

 [I]f we were to accept [the patient’s] argument every mistaken diagnosis of good health would be converted into a constructive fraud.
 

 451 N.E.2d at 341. Thus, an affirmative misrepresentation that the patient is “okay” does not necessarily constitute an active fraudulent concealment.
 

 In the present case, Glaese has not suggested that Hughes actually knew that he failed to diagnose the growth in her chest and intentionally misrepresented to her that she was “okay” in order to conceal from her his failure to correctly diagnose her condition. Such an argument, even if made, would strain credulity.
 

 Instead, Glaese has asserted that Dr. Hughes committed malpractice by “simply ignoring, overlooking, or disregarding” the X-ray in question. In other words, Dr. Hughes allegedly committed medical malpractice by failing to diagnose Glaese’s condition. As such,
 
 Havens,
 
 582 N.E.2d 792, controls
 

 A physician cannot be under a continuing duty to review all files daily to ensure that
 
 *822
 
 he did not misdiagnose a condition of a patient he may not have seen for months or even years. This duty would be completely overwhelming to health care providers, and cut against the purposes of the Medical Malpractice Act.
 
 We hold that when the sole claim of medical malpractice is a failure to diagnose, the omission cannot as a matter of law extend beyond the time the physician last rendered a diagnosis.
 

 582 N.E.2d at 795 (Emphasis added).
 

 Here, the physician-patient relationship ended after the abdominal repair surgery when Dr. Hughes released Glaese to her family physician on November 14, 1989. Thus, the statute of limitations began to run, at the latest, on November 14, 1989, more than two years before the filing of Glaese’s proposed complaint and the trial court erred in denying Dr. Hughes’ motion for summary judgment. Therefore, we must reverse and remand with instructions that Dr. Hughes’ motion for summary judgment be granted.
 

 Judgment reversed.
 

 NAJAM, J., and SHARPNACK, C.J., concur.