Donald H. WRIGHT, Appellant–Plaintiff,

v.

Bruce M. PENNAMPED and Lowe Gray Steele & Hoffman, Appellees–Defendants.

No. 49A05–9405–CV–207.

Court of Appeals of Indiana.

Nov. 9, 1995.

F. Jonathan Zusy, Ancel & Dunlap, Indianapolis, for Appellant.

Richard A. Young, John B. Drummy, Eric D. Johnson, Kightlinger & Gray, Indianapolis, for Appellees.

## OPINION

SHARPNACK, Chief Judge.

Donald H. Wright appeals the trial court's order of summary judgment in favor of the defendant-appellees, Bruce M. Pennamped and his law firm, Lowe Gray Steele & Hoffman ("the Appellees"). Wright is seeking damages arising from the Appellees' alleged deceptive and fraudulent conduct during a commercial loan transaction. Wright raises four issues for our review, which we consolidate and restate as whether the trial court erred in granting summary judgment. We affirm in part and reverse in part.

### *Facts*

The facts most favorable to Wright, the nonmoving party, are as follows. Wright is a self-employed general contractor and real estate developer who lives in Beech Grove, Indiana. He owns and operates a sixty unit apartment complex in Beech Grove called the Diplomat Apartments. In early 1991, Wright began looking to refinance the Diplomat Apartments in the amount of $500,000.00.

On May 29, 1991, Ray Krebs, the vice president of mortgage banking at SCI Financial Corporation ("SCI"), submitted a proposal of financing to Wright. In pertinent part, the proposal provided:

"[SCI] is please to submit the following proposal for financing for the Diplomat Apartments. This proposal is ... offered subject to final credit approval by SCI and any funding participant(s). Final terms and conditions will be established by SCI and its legal counsel during review of the information requested herein.

\* \* \* \* \* \*

PREPAYMENT: Not available during the first 12 months. Thereafter, at an amount consistent with the Federal Home Loan Bank of Indianapolis prepayment formula.

\* \* \* \* \* \*

DOCUMENTATION: All documentation must be in a form and substance acceptable to SCI and its assigns."

Record, pp. 334–36. Wright accepted the proposal on June 3, 1991. Wright did not understand the prepayment provision prior to signing the proposal and anticipated that he would have his attorney, Richard L. Brown, explain any provisions Wright did not understand when Brown received the proposed loan documents prior to closing. Brown had acted as Wright's counsel for approximately thirty years. Wright had regularly consulted with Brown with regard to real estate transactions and utilized Brown's services in connection with the loan transaction underlying the present litigation.

After signing the proposal, Wright provided Brown's name, address, and telephone number to Krebs. Krebs then relayed this information to Pennamped. Pennamped, a partner in the law firm of Lowe Gray Steele & Hoffman, became involved in the loan transaction on July 2, 1991, when he had a luncheon meeting with Krebs. SCI retained Pennamped and the firm to represent its interests and to prepare the necessary loan documents. At the direction of Krebs, Pennamped began drafting the loan documents on or about July 15th. Pennamped drafted the loan documents on July 31, 1991, and forwarded copies marked "DRAFT DATED *7–31–91*" to Krebs and Brown.

A draft mortgage note was among the many draft loan documents hand delivered to Brown. The prepayment provision of the draft note read:

"Borrower may not prepay the principal balance of the Loan, or any part thereof, at any time during the first (1st) Loan Year of the Loan. Borrower shall have the right to prepay the Loan, in whole but not in part, upon ten (10) days written notice first given Lender, after the first (1st) Loan Year. The Borrower, in the event of prepayment, shall pay Lender a fee equal to one percent (1%) of the then outstanding principal balance together with accrued interest until payment is received by Lender."

Record, pp. 340–41.

On Friday, August 2, 1991, Brown reviewed the draft documents and discussed them with Wright. Brown and Wright discussed the prepayment provision as well as additional terms in the draft documents. Wright did not indicate to Brown that the prepayment provision in the draft note was any different than the one in the proposal for financing. Based on their discussion, both Wright and Brown accepted and approved the form and substance of the draft documents.

On August 1, 1991, Krebs mailed a copy of the draft documents to Don Wilson, Senior Vice President of Kentland Bank which was the funding bank. Wilson received and reviewed the documents on August 2nd. Wilson marked various provisions of the loan documents, including the prepayment penalty provision. At his deposition, Wilson testified the prepayment penalty provision was to be consistent with the Federal Home Loan Bank prepayment penalty, rather than a flat one percent. Upon completion of Wilson's initial review, Wilson and Krebs discussed a number of changes to be made to the draft loan documents, including those necessary to the prepayment penalty provision.

Late in the day on Friday, August 2, 1991, Krebs contacted Pennamped regarding Wilson's request for changes to the draft loan documents. Pennamped's timesheet for August 2, 1991, includes an entry identified as "revise documents" which indicates that he spent a quarter of an hour working on the loan transaction. Record, p. 570. Krebs pursued the Friday conversation with Pennamped on the morning of Monday, August 5th. Krebs sent a facsimile transmission of the changes, including a new prepayment penalty clause, to Pennamped with a cover transmittal sheet that stated "Don Wright Loan Document changes per our discussion." Record, p. 544.

Also on Monday, Brown and Pennamped discussed the transaction and the draft loan documents. Pennamped asked Brown if he had any problems with the proposed loan documents, and Brown responded that he did not. Brown informed Pennamped he had two cases set for the following morning and he would be unable to attend the closing set for 9:00 a.m. on August 6, 1991. Brown also spoke with Krebs on August 5th. Neither Pennamped nor Krebs informed Brown that they anticipated making any changes to the loan documents. Brown prepared his opinion letter for the closing with specific reference to the draft loan documents dated July 31, 1991.[1]

After Pennamped received the facsimile of the changes, he spoke with Krebs and indicated that somebody needed to speak with the borrower, Wright, to explain the changes in the prepayment penalty clause. Krebs informed him that he would take care of it. Pennamped neither attempted to reach Brown to inform him of the changes nor followed up to see if Krebs had contacted Wright with the changes. Pennamped completed the changes to the loan documents on

---

1. The Appellees contest whether Krebs telephoned Pennamped on the afternoon of August 2nd regarding the changes requested by Wilson. Pennamped testified at his deposition that he may have had "some peripheral conversation" regarding the transaction with Krebs between July 31st and receiving the facsimile from Krebs on August 5th, but that he did not know that there were any conversations of substance regarding the draft documents during that time frame.

Record, p. 1417.

Pennamped also testified that he believed that his August 5th conversation with Brown occurred prior to receiving Krebs' facsimile, because if that conversation had occurred after receiving the facsimile, he would have discussed "that issue" with him. Record, p. 1417.

As noted above, in reviewing an order for summary judgment, we must consider the facts in the light most favorable to the nonmoving party, Wright.

the afternoon of August 5, 1991. Krebs did not inform Wright of the changes.[2]

The loan closing occurred on Tuesday, August 6, 1991. Because Brown was in court, Wright attended the closing alone. Pennamped, Krebs, Wilson, and a representative of the title insurance company who acted as the closing agent were also at the closing. The closing agent handed Wright each of the loan documents and identified each document for Wright. Wright executed the documents as they were presented to him, including the revised note and mortgage that had been changed the previous afternoon. Wright did not review the documents prior to signing them because he believed them to be the same documents that his attorney, Brown, had reviewed. Wright was never informed of the revisions that had been made to the draft loan documents. After the documents were signed, Kentland disbursed the loan proceeds to Wright.

In September of 1992, Wright obtained a favorable refinancing commitment from another lender. Brown contacted Kentland Bank to obtain a payoff statement. The prepayment penalty quoted by Kentland Bank was far greater than the one percent Brown had anticipated. Brown requested and obtained a copy of the note via facsimile.[3] The note signed by Wright contained a formula for the prepayment penalty, rather than the one percent penalty that appeared in the draft note. Brown never saw the prepayment provision contained in the final note prior to receiving the facsimile from the bank. The final note contained the following prepayment provision:

"Borrower may not prepay the principal balance of the Loan, or any part thereof, at

any time during the first (1st) Loan Year of the Loan. Borrower shall have the right to prepay the Loan, in whole but not in part, upon ten (10) days written notice first given Lender, after the first (1st) Loan Year. The Borrower, in the event of prepayment, shall pay Lender a fee equal to the greater of: i) the sum of (a) the present value of the scheduled monthly payments on the Loan from the date of prepayment to the maturity date and (b) the present value of the amount of principal and interest due on the maturity date of the Loan (assuming all scheduled monthly payments due prior to maturity were made when due) minus (c) the outstanding principal Loan balance as of the date of prepayment. The present values described in (a) and (b) are computed on a monthly basis as of the date of prepayment discounted at the rate of the U.S. Treasury Note or Bond closest in mautrity [sic] to the remaining term of this Loan (as reported in the Wall Street Journal on the fifth business day preceding the date of prepayment) plus 250 basis points; ii) one percent of the then outstanding principal balance."

Record, pp. 353–54.

On July 1, 1993, Wright paid $595,799.09 to Kentland Bank, under protest, representing payment in full of the loan, including all outstanding principal and interest, as well as the prepayment penalty of $97,504.38 calculated under the terms of the final note.

As of the July 1, 1993, payoff date, the principal balance of the note was $493,148.71. Under the terms of the draft note, a one percent prepayment penalty would have been $4,931.49. This amount is approximately

Record, p. 101.

2. Krebs testified during his deposition that he called Wright on August 5th, the day before the closing, and generally informed him of the changes. However, Wright disputes that Krebs advised him of the changes. In his affidavit, Wright asserted:

"At no time on August 5, 1991, or at any other time prior to the closing did I have any telephone conference, face-to-face meetings, or any other discussions or communications of any kind with Raymond E. Krebs in any manner concerning changes or revisions that were made or were contemplated to be made to the loan documents involved in this action."

3. Wright testified that upon learning of the higher prepayment penalty demanded by Kentland Bank, he contacted Wilson and requested copies of the final loan documents. Wright had requested copies of the loan documents at the closing. Krebs indicated that he had to provide Brown with copies, and that Wright should obtain his copies from Brown. However, Krebs did not provide Brown with copies of the documents.

$92,500.00 less than that amount required under the terms of the final, revised note. In addition, the prepayment penalty charged by Kentland Bank was approximately $60,000.00 greater than the amount charged under the Federal Home Loan Bank formula. On July 18, 1993, Wright filed a complaint for damages against Kentland Bank, Krebs, SCI, Pennamped, and Lowe Gray Steele & Hoffman. Wright sought recovery from the defendants based on fraud, constructive fraud and breach of fiduciary relationship, obtaining money and property by false pretenses, deception, criminal mischief, conversion and theft, and forgery. Wright subsequently amended his complaint to include a count based on breach of implied contract.

On September 8, 1993, the Appellees filed their motion for summary judgment. On December 1, 1993, Wright filed his opposition to the motion for summary judgment. Following a hearing on December 21, 1993, the trial court took the motion under advisement. On March 4, 1994, the trial court issued its order granting the Appellees' motion for summary judgment. The trial court found that an essential element of each of Wright's non-contractual theories is the intent to deceive and that Wright failed to come forward with any evidence supporting an inference of fraud. The court held that the Appellees had no contractual duty to Wright and therefore, Wright's breach of implied contract claim must fail. The trial held there was no just cause for delay and ordered the entry of final judgment in favor of the Appellees. Wright appeals this judgment.

### Discussion

■ When we review a trial court's entry of summary judgment, we are bound by the same standard as the trial court. *Ayres v. Indian Heights Volunteer Fire Dept., Inc.* (1986), Ind., 493 N.E.2d 1229, 1234. We may consider only those portions of the pleadings, depositions, answers of interrogatories, admissions, matters of judicial notice, and any other matters designated to the trial court by the moving party for purposes of the motion for summary judgment. *Rosi v. Business Furniture Corp.* (1993), Ind., 615 N.E.2d 431, 434; Ind. Trial Rule 56(C), (H). We may not reverse a granting of summary judgment on the grounds that there is a genuine issue of material fact unless the material fact and relevant evidence were specifically designated to the court. *Rosi,* 615 N.E.2d at 434. "The appellant bears the burden of proving that the trial court erred in determining that there are no genuine issues of material fact and that the moving party was entitled to judgment as a matter of law." *Id.* Any doubt as to the existence of an issue of material fact, or an inference to be drawn from the facts, must be resolved in favor of the nonmoving party. *Cowe v. Forum Group, Inc.* (1991), Ind., 575 N.E.2d 630, 633. "A genuine issue of material fact exists where facts concerning an issue which would dispose of the litigation are in dispute or where the undisputed facts are capable of supporting conflicting inferences on such an issue." *Scott v. Bodor, Inc.* (1991), Ind.App., 571 N.E.2d 313, 318.

Thus, we turn to an examination of the specific theories under which Wright seeks recovery. We consolidate and restate Wright's theories as quasi-contract, actual fraud, and constructive fraud. We affirm the trial court's ruling with respect to quasi-contract. We reverse with respect to actual fraud and constructive fraud.

### I. Quasi–Contract

■ Wright contends that a quasi-contract existed with Pennamped. Courts have used the phrases quasi-contract, contract implied-in-law, constructive contract, and quantum meruit synonymously. *City of Indianapolis v. Twin Lakes Enterprises, Inc.* (1991), Ind. App., 568 N.E.2d 1073, 1078, *reh'g denied, trans. denied.* They are all legal fictions created by courts of law to provide remedies which prevent unjust enrichment and thereby promote justice and equity. *Id.* Their purpose is to provide the injured party with the fair value of the work and services rendered and thus prevent unjust enrichment to another. *Id.*

■ To prevail on a claim of unjust enrichment, a plaintiff must establish that a measurable benefit has been conferred on the defendant under circumstances in which the defendant's retention of the benefit without payment would be unjust. *Bayh v. Son-*

*nenburg* (1991), Ind., 573 N.E.2d 398, 408, *reh'g denied, cert. denied,* 502 U.S. 1094, 112 S.Ct. 1170, 117 L.Ed.2d 415. Principles of equity prohibit unjust enrichment in cases where a party accepts the unrequested benefits another provides despite having the opportunity to decline those benefits. *Olsson v. Moore* (1992), Ind.App., 590 N.E.2d 160, 163, *reh'g denied.*

 Wright claims he conferred a benefit to Pennamped when he paid Pennamped for his services out of the loan proceeds. We disagree. Recovery under quasi-contract requires the plaintiff to establish that the defendant impliedly or expressly requested the benefit be conferred. *Biggerstaff v. Vanderburgh Humane Society, Inc.* (1983), Ind. App., 453 N.E.2d 363, 364. The loan transaction between Wright and SCI provided that Wright would be responsible for all transaction costs, including the fee of the drafting attorney. When Wright received the loan proceeds, Pennamped's fee had already been taken out of the proceeds. Therefore, Wright did not confer a benefit upon Pennamped, but rather relieved SCI of the obligation to pay transaction costs.

Since Wright did not confer a benefit on Pennamped, it is unnecessary to discuss whether Pennamped was unjustly enriched. We hold the trial court did not err in granting summary judgment on Wright's claim for implied contract.

## II. Actual Fraud

 The elements of actual fraud are: (1) the fraud feasor must have made at least one representation of past or existing fact; (2) which was false; (3) which the fraud feasor knew to be false or made with reckless disregard as to its truth or falsity; (4) upon which the plaintiff reasonably relied; (5) and which harmed the plaintiff. *Scott,* 571 N.E.2d at 319. An intent to deceive, or "scienter," is an element of actual fraud, whether classified as a knowing or reckless misrepresentation or as an additional element to a knowing or reckless misrepresentation. *Cf. Block v. Lake Mortgage Co., Inc.* (1992), Ind.App., 601 N.E.2d 449, 451, *reh'g denied; Lawyers Title Insurance Corp. v. Pokraka* (1992), Ind., 595 N.E.2d 244, 249, *reh'g denied.* Fraud may be proven by cir-

cumstantial evidence, provided there are facts from which the existence of all of the elements can be reasonably inferred. *Plymale v. Upright* (1981), Ind.App., 419 N.E.2d 756, 760.

Wright argues he has designated sufficient evidence to survive summary judgment on his actual fraud claim. Wright contends that we should reverse the granting of summary judgment because he has shown (1) that Pennamped made a representation of past or existing fact to Wright or Brown, (2) that Wright relied on representations by Pennamped, or (3) that Pennamped acted with actual knowledge of the falsity of any representations made or in reckless disregard of their falsity. We agree.

First, Wright claims Pennamped's failure to inform Brown of the changes in advance of the closing and Pennamped's presentation of the documents for Wright's signature, "while continuing to remain silent, constituted a representation by Pennamped that the documents so presented were in form and substance identical to the documents that had been submitted to Brown." Appellant's brief, p. 32. Construing the facts in the light most favorable to Wright, we agree that Pennamped, by remaining silent and not informing Brown or Wright of the changes to the loan documents, impliedly represented that the final loan documents conformed to the draft loan documents which had been reviewed and approved by Brown. *See, Matter of Gerard* (1994), Ind., 634 N.E.2d 51, 53 (implied in attorney's retention of excessive fee was the false representation that the services he provided roughly corresponded with the amount of compensation); *see also Midwest Commerce Banking v. Elkhart City Centre* (7th Cir.1993), 4 F.3d 521, 524 ("Omissions are actionable as implied representations when the circumstances are such that a failure to communicate a fact induces a belief in its opposite").

The Appellees contend, however, that Pennamped's "silence" cannot be construed as a representation in the present case because Pennamped had no duty to speak. We disagree.

The Appellees are correct that silence will not support a claim for actionable fraud absent a duty to speak or to disclose facts. *See, e.g., Jackson v. Blanchard* (1992), Ind.App., 601 N.E.2d 411, 418; *Barnd v. Borst* (1982), Ind.App., 431 N.E.2d 161, 168. In addition, the party alleging fraudulent concealment has the burden of demonstrating the existence of a duty to speak. *Barnd,* 431 N.E.2d at 168. We conclude, however, that Wright has satisfied this requirement.

By undertaking the tasks of a drafting attorney, including the distribution of draft loan documents and the solicitation of review and approval of the documents, Pennamped assumed a duty to disclose any changes in the documents prior to execution to the other parties or their respective counsel. *See Hughes v. Glaese* (1994), 637 N.E.2d 822, 825 (duty to disclose material information arises where there is a fiduciary or confidential relationship between the parties). The existence of such as duty is supported by common sense and notions of fair dealing. Thus, Pennamped, as the drafting attorney, had a duty to inform Brown or, in his absence, Wright, of any changes occurring after Brown's review and approval of the loan documents. Were the rule otherwise, pre-closing review of loan documentation would become a futile act, and counsel would be required to scrutinize every term of each document at the moment of execution.

Wright's second contention is that he had a right to rely on representations made by Pennamped. However, the Appellees contend Wright did not have a right to rely because he "was an experienced business man who had full access to all relevant facts at all times." Appellees brief, p. 35 (citing *Pugh's IGA v. Super Food Services, Inc.* (1988), Ind.App., 531 N.E.2d 1194, 1198, *reh'g denied, trans. denied,* and *Biberstine v. New York Blower Co.* (1993), Ind.App., 625 N.E.2d 1308, 1315, *reh'g denied.* )

A person relying upon the representations of another is bound to exercise ordinary care and diligence to guard against fraud. *Plymale,* 419 N.E.2d at 762.

" [H]owever, the requirement of reasonable prudence in business transactions is not carried to the extent that the law will ignore an intentional fraud practiced on the unwary. [*Grissom v. Moran* (1972), 154 Ind.App. 419, 290 N.E.2d 119] A person has a *right to rely* upon representations *where the exercise of reasonable prudence does not dictate otherwise. Voorhees v. Cragun* (1916), 61 Ind.App. 690, 112 N.E. 826.' (Emphasis added.)"

*Plymale,* 419 N.E.2d at 762 (quoting *Soft Water Utilities, Inc. v. Le Fevre* (1974), 159 Ind.App. 529, 536–37, 308 N.E.2d 395, 398). Where the evidence is conflicting, the issue of whether a particular person has exercised reasonable prudence and whether the reliance was justified is for a jury's determination. *Id.* at 763. Where the evidence is susceptible to only one interpretation, however, "it is for the court to determine as a matter of law whether plaintiff was justified in relying on the representation and whether he was negligent in doing so." *Id.* at 763 n. 6 (quoting 37 C.J.S. *Fraud* § 129, pp. 455–56).

As has been noted recently by our supreme court, a demanding standard is applied with regard to the representations made by attorneys. *Fire Insurance Exchange v. Bell* (1994), Ind., 643 N.E.2d 310, 312. "A lawyer's representations have long been accorded a particular expectation of honesty and trustworthiness." *Id.* "The law should promote lawyers' care in making statements that are accurate and trustworthy and should foster the reliance upon such statements by others." *Id.* at 313.

Undoubtedly, Wright exercised ordinary care and diligence by having his attorney review the loan documents prior to closing. Similarly, Brown had a right to rely on the alleged misrepresentations made by Pennamped, as did Wright at the closing. *See id.* Contrary to the Appellees' position, Wright was under no obligation to review documents at the closing once they had been reviewed and approved by his attorney, absent some indication from Pennamped that changes had been made. As a matter of law, Wright established a reasonable right of reliance on Pennamped's alleged misrepresentations. *See id.*

Wright's third contention is that Pennamped acted with actual knowledge of the falsity of any representations made or in reckless disregard of their falsity. Wright claims the trial court erred because the presence of fraudulent intent is a factual issue for the jury and the evidence supports a reasonable inference of intent to deceive when viewed in the light most favorable to Wright. We agree.

The determination of whether fraudulent intent is present is a question for the fact finder. *U.S. Marketing Concepts, Inc. v. Don Jacobs Buick–Subaru, Inc.* (1989), Ind. App., 547 N.E.2d 892, 894, *reh'g denied.*

> "There is no precise formula for drawing the line as to when there are sufficient indicia to constitute a determination of fraud. The general rule is that when there is a concurrence of several 'badges of fraud'—'an inference of fraudulent intent *may* be warranted.' (Our emphasis). *Arnold v. Dirrim* (1979), Ind.App., 398 N.E.2d 442, 446. Because no one badge of fraud constitutes a per se showing of fraudulent intent the facts must be taken together to determine how many badges of fraud exist and if together they constitute a pattern of fraudulent intent. This determination is for the fact finder."

*Jones,* 547 N.E.2d at 890. In the present case, the Appellees contend the trial court correctly determined the intent issue as a matter of law because the only reasonable inference to be drawn from the undisputed evidence is there was no fraudulent intent on the part of the Appellees.

In issuing its ruling on the motion for summary judgment, the trial court held:

> "Here, it is uncontroverted that attorney Pennamped, upon learning of his client's intention to make last minute changes in the loan documents, instructed his client to notify the Plaintiff immediately of such changes and stressed the importance of such notification. In the face of such uncontroverted evidence, it is incumbent upon the Plaintiff to come forward with some evidence supporting an inference of fraud. The Plaintiff has failed to do so."

Record, p. 247. Although we would agree that the evidence supports finding an absence of fraudulent intent, we do not agree that the evidence on this issue is uncontroverted.

Viewing the evidence in the light most favorable to Wright, Pennamped first learned that changes would be made to the loan documents on Friday, August 2, 1991. Pennamped received the changes via facsimile during the morning hours of Monday, August 5, 1991, the day prior to closing. Although speaking with Brown by telephone on August 5th, and although aware that Brown would be unable to attend the closing, Pennamped did not tell Brown the documents had been or would be changed. Pennamped neither informed Wright that changes had been or would be made after Brown's review and approval nor made any attempt to confirm that Krebs had informed Wright of the changes.

Wright has designated evidence showing that Pennamped knew there were last minute changes made to the loan documents and that Pennamped failed to inform Wright and his counsel of these changes. This is evidence from which a jury might infer an intent to deceive on the part of Pennamped and the law firm. Although the designated evidence would also allow a jury to conclude that Pennamped and the law firm had no fraudulent intent, "[t]he mere improbability of recovery does not justify summary judgment and the procedure is not intended to be a summary trial." *Jones,* 547 N.E.2d at 891.

We conclude, therefore, that the trial court erred in granting summary judgment on Wright's claim for actual fraud.

### III. Constructive Fraud

The elements of constructive fraud include:

> " '1. a duty owing by the party to be charged to the complaining party due to their relationship,
>
> 2. violation of that duty by the making of deceptive material misrepresentations of past or existing facts or remaining silent when a duty to speak exists,
>
> 3. reliance thereon by the complaining party,

4. injury to the complaining party as a proximate result thereof, and

5. the gaining of an advantage by the party to be charged at the expense of the complaining party.' "

*Block,* 601 N.E.2d at 451 (quoting *Pugh's IGA,* 531 N.E.2d at 1197). Contrary to the trial court's ruling in the present case, intent to deceive is not an element of constructive fraud. *See id.* Instead, the law infers fraud from the relationship of the parties and the surrounding circumstances. *Id.* The Appellees contend that the trial court nonetheless properly entered summary judgment in their favor on Wright's claim for constructive fraud because there is an absence of the type of relationship which may form a basis of a claim for constructive fraud. Furthermore, Appellees contend this relationship did not give rise to a legal duty to disclose.

In support of their position, the Appellees cite *Hardy v. South Bend Sash & Door Co.* (1992), Ind.App., 603 N.E.2d 895, *reh'g denied, trans. denied,* and *Comfax v. North American Van Lines* (1992), Ind.App., 587 N.E.2d 118. In *Hardy,* this court affirmed the entry of summary judgment on the plaintiff's claim for constructive fraud due to the absence of a fiduciary or confidential relationship between the parties. *Hardy,* 603 N.E.2d at 901. Similarly, in *Comfax,* this court affirmed the entry of summary judgment on plaintiffs' constructive fraud claim because the plaintiff failed to demonstrate the existence of the requisite special relationship. *Comfax,* 587 N.E.2d at 125–26. In *Comfax,* the plaintiffs argued the existence of a fiduciary relationship was established. *Id.* at 126.

As we have observed previously, however, "Defendants are mistaken in arguing that constructive fraud can *only* exist where there is a confidential or fiduciary relationship. In Indiana, the term constructive fraud encompasses several related theories. All of these theories are premised on the understanding that there are situations which might not amount to actual fraud, but which are so likely to result in injustice that the law will find a fraud despite the absence of fraudulent intent. Defendants are correct in asserting that a constructive fraud may be found where one party takes unconscionable advantage of his dominant position in a confidential or fiduciary relationship. [citations omitted] This is not, however, the exclusive basis for the theory of constructive fraud.

In Indiana constructive fraud also includes what other jurisdictions have termed 'legal fraud' or 'fraud in law.' [footnote omitted] *This species of constructive fraud recognizes that certain conduct should be prohibited because it is inherently likely to create an injustice....* "

*Scott,* 571 N.E.2d at 323–24 (emphasis added). Thus, we find the Appellees' reliance upon *Hardy* and *Comfax* to be of no avail.

The Appellees' also cite *Hacker v. Holland* (1991), Ind.App., 570 N.E.2d 951, *reh'g denied,* and we are similarly unpersuaded. In *Hacker,* the plaintiff, Hacker, contracted to sell a tavern to Evans. The purchase price included $20,000 for the transfer of the tavern's liquor license. *Id.* at 952. Evans, with Hacker's agreement, retained the defendant-attorney, Holland, as the attorney to handle the closing. Hacker did not retain independent counsel. *Id.*

Holland prepared the closing contract and warranty deed pursuant to Evans' instructions. Under the contract, $20,000 for the liquor license was expected as payment upon the transfer of the license. The $20,000 balance owing was not secured, and the contract made no provision for interest payable on the balance. *Id.* At the closing, Evans and Hacker individually read the contract, and then Holland read it aloud to them prior to execution. Evans and Hacker each paid $80 of Holland's $160 fee. *Id.* Following the transaction and certain payments from Evans to Hacker, a balance due of $13,000 remained, for which Evans gave Hacker a note. Hacker was unsuccessful in her attempts to collect the $13,000 balance from Evans, but she never brought suit on the note. *Id.*

Hacker sued Holland for legal malpractice and argued that Holland had negligently breached his duty of care to her. *Id.* at 954–55. In support of her case, Hacker argued

that an attorney-client relationship existed between Holland and her and that Holland had breached his duty of care to her by failing to secure Evans' debt or to provide for interest payments on the debt. *Id.* at 955. The controlling inquiry was whether Holland acted solely as Evans' attorney or as attorney to both Evans and Hacker. *Id.* This court wrote in part:

> "In the context of real estate transactions, it is most difficult for the disgruntled party on one side of the transaction to demonstrate an attorney-client relationship with the attorney for the other party to the transaction. This is so because attorneys do not owe a duty of care to non-clients except in the context of third party beneficiaries ... and because the interests involved are usually in opposition...."

*Id.* This court held that although Hacker and Holland could have had an attorney-client relationship, Holland's preparation of the closing documents and control over the closing were insufficient standing alone, to create such a relationship or to render Holland liable for negligence. *Id.* at 956. In a separate discussion, the court rejected Hacker's claim for constructive fraud, noting in pertinent part Hacker had "alleged no deceptive silence or representations by Holland as Evans's attorney which would constitute a breach of duty." *Id.* at 958.

In the present case, Wright neither asserts that an attorney-client relationship existed between Pennamped and him, nor alleges a breach of a duty of care. Instead, Wright focuses on the duty to disclose which is a duty independent of the attorney-client relationship between Wright and Pennamped. Unlike the plaintiff in *Hacker*, Wright alleged deceptive silence or representations by Pennamped as lender's counsel. We find *Hacker* to be inapplicable to the present case, and the Appellees' reliance upon this case is misplaced.

 Considering the facts in the light most favorable to Wright and contrary to the Appellees' contentions on appeal, this case is amenable to the application of the doctrine of constructive fraud. The facts as alleged by Wright suggest a situation that is so likely to result in injustice that the law will find a

fraud despite the absence of fraudulent intent. *See Scott,* 571 N.E.2d at 323–24. The material alteration of loan documents after the review and approval of those documents by opposing counsel and the presentation of the revised documents for execution with no indication that changes have been made is the sort of conduct which "should be prohibited because it is inherently likely to create an injustice...." *Id.* at 324.

In the alternative, Appellees contend this relationship did not give rise to a legal duty. Appellees claim that Pennamped did not owe Wright a duty to disclose the changes made to the loan documents. Furthermore, Appellees argue that even if Pennamped did have a duty, Pennamped satisfied this duty by delegating the performance to Krebs. We disagree.

 A party to a contract has a duty to the other party to disclose changes. *Peoples Trust & Savings Bank v. Humphrey,* (1983), Ind.App., 451 N.E.2d 1104, 1112. The Appellees argue that although Pennamped altered the contract, he did not owe a duty to Wright because Pennamped was not a party to the contract.

Contrary to Appellees' contention, as discussed previously, we find that Pennamped had a duty to disclose. As the drafting attorney, Pennamped assumed a duty to inform Wright of any changes to the loan documents prior to their execution. *See Hughes,* 637 N.E.2d at 825.

In opposing the motion for summary judgment, Wright submitted the affidavit of Richard L. Johnson, the senior partner in the law firm of Johnson Smith Densborn Wright & Heath. The significance of this affidavit was to establish the customs and practices of financing transactions. Johnson commenced the practice of law in 1972 and has concentrated his practice in the areas of banking law, real estate law, and commercial law. After setting forth his qualifications and extensive experience as lender's counsel and in drafting or preparing documents to be used in lending transactions, Johnson's affidavit states:

> "Based upon my experience as lender's counsel, I believe the following to be the

customs and practices in the industry in relation to real estate and/or commercial financing transactions:

(a) At any time changes or revisions are made to draft or proposed loan documents by the attorney charged with the responsibility of drafting such documents—no matter how trivial or seemingly insignificant such changes or revisions may be—it is expected and understood by all other attorneys involved in the transaction that the drafting attorney will take whatever steps are necessary and/or appropriate to fully disclose and identify all such document changes and revisions to other attorneys involved in the transaction.

(b) Typically, when any changes or revisions are made to proposed or draft loan documents, the drafting attorney will circulate, in writing, a 'red-lined' copy or some other written materials which will highlight and/or more particularly identify and/or describe the changes and revisions that have been or are contemplated to be made.

(c) At the very least, the drafting attorney is responsible to verbally disclose to all other attorneys involved in the transaction—prior to execution of final documents—any and all changes and revisions that the drafting attorney has made to previously-distributed draft documents.

(d) Any changes or revisions to the substance or form of documents which have been previously circulated to the participating attorneys should be fully disclosed to such other attorneys.

(e) The closing of the transaction should not occur until final revisions to the loan documents have been fully disclosed to and approved by all parties and their respective counsel."

Record, pp. 117–18. Based on this relationship, Wright could expect that Pennamped would inform him of any changes in the loan documents. Therefore, Pennamped had a duty to disclose material information to Wright concerning the loan documents. *See id.*

Furthermore, Appellees' argument is in contradiction with Rule 4.1(b) of the Rules of Professional Conduct which states, "[i]n the course of representing a client a lawyer shall not knowingly . . . (b) fail to disclose that which is required by law to be revealed." Ind. Professional Conduct Rule 4.1(b). As previously stated, the drafting attorney assumes a duty to disclose any changes in the documents prior to execution to the other parties. *See id.*

Courts hold attorneys to a separate and more demanding standard than the attorneys' clients. *Fire Insurance Exchange,* 643 N.E.2d at 312. Pennamped may have assisted his client, Krebs, in the commission of constructive fraud by failing to disclose to Wright that Pennamped changed the loan documents. Since Pennamped knew the documents were altered, he had a duty to disclose.

Lastly, we address whether Pennamped delegated his duty to Krebs. Pennamped may have created an agency relationship where he was the principal and Krebs was his agent within this narrow scope of disclosing changes to Wright. Therefore, Pennamped may have discharged his duty by delegating it to Krebs. However, this raises a question of whether Pennamped actually instructed Krebs to inform Wright of the changes. The existence of an agency is a question of fact, therefore this issue should be decided by a trier of fact and not decided upon summary judgment. *Bryan Mfg. Co. v. Harris* (1984), Ind.App. 459 N.E.2d 1199, 1204.

We conclude, therefore, that the trial court erred in granting summary judgment on Wright's claim for constructive fraud.

To sum up, while we affirm the trial court's entry of summary judgment for the defendant on the theory of quasi-contract, we reverse summary judgment on the theories of actual and constructive fraud. The case is remanded to the trial court for further proceedings consistent with this opinion.

**AFFIRMED IN PART, REVERSED and REMANDED.**

DARDEN and BAKER, JJ., concur.